UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEANETTE SEPEDA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.: 1:14-cv-00228 - JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF JEANETTE SEPEDA AND AGAINST DEFENDANT CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY |

Plaintiff Jeanette Sepeda asserts she is entitled to supplemental security income under Title XVI of the Social Security Act, and seeks judicial review of the decision denying her application for benefits. Plaintiff argues the administrative law judge ("ALJ") erred in evaluating whether her impairments meet or medically equal Listing 12.05. Because the ALJ failed to resolve the conflict in the record related to the validity of Plaintiff's IQ scores, the ALJ's decision is **REMANDED** for further proceedings.

## PROCEDURAL HISTORY

Plaintiff filed an application for supplemental security income on April 6, 2010, alleging disability beginning July 21, 2008. (Doc. 15-3 at 22.) The Social Security Administration denied her claim initially and upon reconsideration. *Id.* After requesting a hearing, Plaintiff testified before an ALJ on March 9, 2012. (*Id.* at 38.) The ALJ determined Plaintiff was not disabled under the Social

1

Security Act, and issued an order denying benefits on April 25, 2012. (*Id.* at 22-30.) Plaintiff requested review by the Appeals Council of Social Security, which denied review of the ALJ's decision on November 27, 2013. (*Id.* at 12-14.) Therefore, the ALJ's determination became the decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). When a claimant establishes a prima facie case of

1  disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other

2  substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## DETERMINATION OF DISABILITY

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 20 C.F.R. §§ 404.1520, 416.920. The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider objective medical evidence and opinion (hearing) testimony. 20 C.F.R. §§ 416.927, 416.929.

### A.   Relevant Medical Evidence[1]

Susan Parker, LMFT, conducted an initial comprehensive assessment at Fresno County Mental Health on August 7, 2009. (Doc. 15-9 at 41.) Plaintiff requested medication for depression, and reported she starting hearing voices in 2002 when she was "using a lot of drugs." (*Id.*) Plaintiff said she last used cocaine one month before and had not consumed alcohol for 22 days. (*Id.* at 42.) Ms. Parker believed Plaintiff's thoughts were logical and focused, and her memory was fair. (*Id.* at 44.) Ms. Parker gave Plaintiff a Global Assessment Functioning score of 60.[2] (*Id.* at 39, 44.)

Dr. Edmund Kal, a psychiatrist, treated Plaintiff on September 1, 2009. (Doc. 15-9 at 31-32.) Plaintiff reported she had been out of medication for several weeks and "felt thoroughly incapacitated." (*Id.* at 31.) Dr. Kal observed that Plaintiff's cognition and orientation were normal, and her thought processes were organized. (*Id.*) Further, Dr. Kal believed that Plaintiff's intelligence was average. (*Id.*)

---

[1] Plaintiff contests only the ALJ's findings related to whether her mental impairments satisfies Listing 12.05. Therefore, the only relevant evidence relates to Plaintiff's mental impairments.

[2] Global Assessment Functioning ("GAF") scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-V"). A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *Id.* at 34.

Dr. Kal gave Plaintiff a GAF score of 45.[3]  (*Id.*)

On September 29, 2009, Dr. Jorge Urbina noted Plaintiff had been diagnosed with psychotic disorder, not otherwise specified, and polysubstance dependence.  (Doc. 15-9 at 38.)  Dr. Urbina noted that Plaintiff was complaint with her medication treatment, and her symptoms had "improved."  (*Id.*)  According to Dr. Urbina, Plaintiff's cognition, speech, orientation, and mood were "normal."  (*Id.*)  In addition, Dr. Urbina opined that Plaintiff's intelligence was "average."  (*Id.*)  Dr. Urbina gave Plaintiff a GAF score of 70.[4]  (*Id.*)

At a follow-up visit with Dr. Urbina on October 27, 2009, Plaintiff denied having any side effects from her medication. (Doc. 15-9 at 39.)  Dr. Urbina noted Plaintiff's symptoms had improved, and gave Plaintiff a GAF score of 80.[5]  (*Id.*)

On March 9, 2010, Dr. Luyen Luu treated Plaintiff for the first time.  (Doc. 15-9 at 27-28.)  Plaintiff reported she previously attempted suicide and felt depressed without her medication.  (*Id.* at 27.)  Dr. Luu decreased the dosage of Plaintiff's medication because Plaintiff did not need the "high dose."  (*Id.*)  According to Dr. Luu, Plaintiff's cognition appeared normal and her thought processes were organized.  (*Id.*)  Dr. Luu opined Plaintiff's intelligence was average.  (*Id.*)  Similarly, in June 2010, Dr. Marina Vea opined that Plaintiff was of average intelligence.  (*Id.* at 23.)

Dr. Aimee Riffel performed a comprehensive psychological evaluation on October 2, 2010. (Doc. 15-8 at 29.)  Plaintiff reported she had a "[d]epressed mood, anxiety, feelings of paranoia, poor concentration, racing thoughts, poor memory, mood swings, sleep problems, difficulty being in crowds and vague thoughts of death."  (*Id.* at 30.)  In addition, Plaintiff said she had a "chronic history of mood symptoms," and attempted suicide by jumping off a bridge in 1996.  (*Id.* at 29.)  Further, Plaintiff admitted to "a history of alcohol use . . . as well as cocaine use."  (*Id.* at 30.)  Plaintiff told Dr. Riffel

---

[3] A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *DSM-IV* at 34.

[4] A GAF score between 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships."  *DSM-IV* at 34.

[5] With a GAF score between 71-80, "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning..." *DSM-IV* at 34.

that she spent "a majority of her day attempting to manage her mental health symptoms, related to depression and anxiety." (*Id.* at 33.)

Dr. Riffel administered several tests, including the Wechsler Adult Intelligence Scale- Fourth Edition ("WAIS-IV") Test, the Bender Visual-Motor Gestalt Test-Second Edition, and the Weschler Memory Scale-Fourth Edition ("WMS-IV") Test. (Doc. 15-8 at 31-33.) Plaintiff had a verbal IQ score of 63, a performance IQ of 63, and a full scale IQ of 63. (*Id.* at 32.) Dr. Riffel noted these results indicated an "Extremely Low intellectual performance." (*Id.*, emphasis omitted.) In addition, Plaintiff's results on the Bender test fell in the "Low level of performance." (*Id.*, emphasis omitted.) Dr. Riffel believed Plaintiff's "Auditory and Visual Memory Index composite scores . . . should be reviewed cautiously" in light of "some variability." (*Id.* at 33.) In evaluating the validity of Plaintiff's test results, Dr. Riffel opined: "These results are considered to be a fair representation of Ms. Sepeda's current psychological functioning." (*Id.* at 31.) Further, Dr. Riffel found Plaintiff "was able to complete a three-step command . . . without hesitation and difficulty." (*Id.*) She opined Plaintiff had "fair concentration, and . . . [was] able to focus on questions and respond appropriately." (*Id.* at 33.) Dr. Riffel diagnosed Plaintiff with "Mild Mental Retardation," "[l]imited social skills, limited coping skills, [and] learning difficulties." (*Id.* at 34.) Dr. Riffel concluded:

> Ms. Sepeda is capable of completing simple and repetitive tasks and would not need additional supervision in the work environment for these types of tasks.
>
> Ms. Sepeda would have some difficulty with complex tasks related to mental health factors.
>
> Ms. Sepeda would have difficulty dealing with overall stress within the work environment related to mental health factors.

(*Id.*) Dr. Riffel believed Plaintiff's "likelihood of recovery [was] fair, and she gave Plaintiff a GAF score of 65. (*Id.*)

Dr. Smith completed a psychiatric review technique form and mental residual functional capacity assessment on November 2, 2010. (Doc. 15-8 at 41-54.) According to Dr. Smith, Plaintiff had mild restriction in activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (*Id.* at 49.) Dr. Smith believed Plaintiff was "not significantly limited" with her ability to understand, remember, and carry out simple

1  instructions; but Plaintiff had moderate limitations with detailed instructions. (*Id.* at 52.) In addition,
2  Dr. Smith opined Plaintiff had moderate limitations in her ability to interact appropriately with the
3  general public, but was "not significantly limited" in other areas of social interaction and adaptation.
4  (*Id.*) Dr. Smith questioned Plaintiff's credibility because she was "performing worse on testing over
5  the past few years." (Doc. 15-8 at 56.)

6  On November 4, 2010, Dr. Daniel Brooks treated Plaintiff at Community Mental Health
7  Center. (Doc. 15-8 at 64; Doc. 15-9 at 22.) Plaintiff reported her "[c]urrent medications [were]
8  working and she [had] no side effects." (*Id.*) Dr. Brooks noted Plaintiff's mood appeared normal, but
9  her affective range was labile. (*Id.*) Further, Dr. Brooks found Plaintiff's insight and judgment were
10 normal, and he opined that Plaintiff's intelligence was average. (*Id.*)

11 Dr. Paxton reviewed the medical record, and noted that Plaintiff "had a normal mood [and]
12 average intelligence." (Doc. 15-8 at 67.) Dr. Paxton affirmed the determination that Plaintiff was able
13 to perform simple, repetitive tasks with limited public contact on December 29, 2010. (*Id.*)

14 In January 2011, Dr. Brooks noted that Plaintiff "reported an increase in depressive symptoms."
15 (Doc. 15-9 at 17.) Dr. Brooks doubled Plaintiff's dosage of Prozac. (*Id.*)

16 In May 2011, Plaintiff admitted that she used cocaine about two to three months prior to her
17 appointment. (Doc. 15-9 at 15.) Plaintiff "denie[d] depression," and said she had "psychosis only
18 when she doesn't take the medication." (*Id.*)

19 On September 8, 2011, Plaintiff was "placed on a 5150 due to overdosing on Naprosyn."
20 (Doc. 15-9 at 7.) She was transported to the hospital, "and released the following day." (*Id.*) At a
21 follow-up appointment on September 14, Plaintiff reported, "I'm not hearing that much voices now,
22 but they are still there. I'm not trying to hurt myself." (*Id.* at 7-8) Dr. John Schaeffer believed that
23 Plaintiff's intelligence was average, and her cognition was normal. (*Id.* at 7.) However, Dr. Schaeffer
24 believed Plaintiff's insight and judgment were impaired. (*Id.*)

25 On October 19, 2011, Plaintiff reported she felt "better" and was "no longer feeling suicidal."
26 (Doc. 15-9 at 5.) Ms. Salazar noted that Plaintiff's medication was "helping keep [her] mood stable
27 and psychotic [symptoms] at a minimum." (*Id.*) Ms. Salazar believed Plaintiff's cognition was
28 normal, her thought processes were organized, and her intelligence was average. (*Id.*)

**B.     Hearing Testimony**

Plaintiff testified before the ALJ at a hearing on March 9, 2012. (Doc. 15-3 at 38.) She said that she attended school until the seventh grade, and she was in special education classes. (*Id.* at 42.) Plaintiff reported she did not have any vocational training and did not "know how to read and write." (*Id.* at 43.) She said she started a GED course through her parole program but was "dropped" because she "was asking for too much help." (*Id.*)

She believed she was unable to work eight hours a day, five days a week because she would "get scared around people" and "run from them." (Doc. 15-3 at 45.) Plaintiff said she heard voices, and got paranoid. (*Id.* at 46.) Also, Plaintiff said she was diagnosed with depression and received treatment at Fresno County Mental Health "every two months." (*Id.*) She reported that medication helped her "to not hear voices" and lessened her depression. (*Id.* at 46-47.) However, Plaintiff said that even with the medicine, she locked herself in her room and cried two or three times a week. (*Id.* 47, 49.)

In addition, Plaintiff said she had problems walking on her left foot, following an injury from a suicide attempt. (Doc. 15-3 at 59-60.) She said she had pain in her hip when she stood or walked "a lot." (*Id.* at 60.) Plaintiff estimated she was able to sit for about "15, 20 minutes" before she needed to stand and walk around. (*Id.* at 62.) In addition, believed she was only able to walk "two blocks" before she needed to take a break for "like 10, 15 minutes." (*Id.* at 63.)

Plaintiff said her daughter cooked her meals, but she was able to microwave simple meals "like burritos." (Doc. 15-3 at 51.) In addition, she reported she cleaned up after herself, including washing dishes. (*Id.*) In addition, Plaintiff said she performed chores including sweeping, mopping, vacuuming, and washing clothes. (*Id.* at 52.) She testified that she went grocery shopping with her daughter "once a month." (*Id.* at 52.) Plaintiff stated she was able to take public transportation but was scared to go on the bus alone. (*Id.* at 44.) As a result, she was always accompanied by a friend or her boyfriend. (*Id.*)

**C.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity following her application date of April 6, 2010. (Doc. 15-3 at 24.) Second, the ALJ

7

found Plaintiff had "the following severe impairments: bipolar disorder; mild mental retardation; post-traumatic stress disorder; and left ankle fracture, status-post open reduction and internal fixation." (*Id.*) At step three, the ALJ found Plaintiff did not have an impairment or a combination of impairments that met or medically equaled a listing, including Listings 1.02, 1.03, 12.04, 12.05 and 12.06. (*Id.* at 24-26.) Next, the ALJ determined:

> [Plaintiff] has the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently, stand and walk 6 hours in an 8-hour workday, and sit 6 hours in an 8-hour workday. She can frequently climb, balance, stoop, kneel, crouch, and crawl. She can perform only unskilled work without public contact.

(*Id.* at 26.) With this residual functional capacity, the ALJ found Plaintiff was able "to perform jobs that exist in significant numbers in the national economy." (*Id.* at 29.) Thus, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 29-30.)

## DISCUSSION AND ANALYSIS

### A.     Step Three of the Evaluation

The Listings set forth by the Commissioner "define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citation omitted, emphasis in original). At step three of the sequential evaluation, the claimant bears the burden of demonstrating that her impairments are the equivalent of listed impairment. *Bowen v. Yuckert*, 482 U.S. 137, 141, 146 n. 5 (1987); 20 C.F.R. §§ 404.1520(d), 416.920(d). "If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step." *Bowen*, 482 U.S. at 141; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).

Here, the ALJ determined Plaintiff's physical impairments did not meet or medically equal a Listing. (Doc. 15-3 at 24-26.) However, Plaintiff argues the ALJ failed to properly consider whether her mental impairments satisfy Listing 12.05(C). (Doc. 19 at 5.) Listing 12.05 governs mental retardation, and requires a plaintiff to demonstrate "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period…" 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 12.05. In addition, paragraph "C" of Listing

12.05 requires a claimant to have "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* The Supreme Court explained, "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. at 530 (emphasis in original).

### 1. Onset during the developmental period

To support the manifestation of significantly subaverage mental functioning, the evidence must "demonstrate[] or support[] onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 12.05. Here, Plaintiff testified that she was enrolled in special education classes and dropped out of school in the seventh grade. (*See* Doc. 15-3 at 26, 42.) Thus, Plaintiff demonstrated her mental impairment manifested itself during the developmental period and satisfies the first requirement of Listing 12.05. *See Sorter v. Astrue*, 389 Fed. App'x. 620, 622 (9th Cir. 2010) (observing a claimant "was in special education classes throughout his school years, showing that his low intellectual functioning manifested prior to age 22"); *Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006) (a claimant presented evidence that his mental retardation was manifested before age 22 when he attended special education classes, dropped out of school in the ninth grade, and had difficulty with core subjects such as reading).

### 2. Valid IQ score of 60 through 70

Dr. Riffel determined Plaintiff had a verbal IQ score of 63, a performance IQ of 63, and a full scale IQ of 63. (Doc. 15-8 at 32.) The ALJ rejected these scores and concluded Plaintiff did "not have a valid verbal, performance, or full scale IQ of 60 through 70." (Doc. 15-3 at 26.) The ALJ observed:

> The only IQ scores in the record were reported by Dr. Aimee Riffel, who suggested those scores should be reviewed with caution. Furthermore, Dr. Riffel suggested Ms. Sepeda's function tests were only a fair indicator of her actual functioning. Ultimately, Dr. Riffel considered the totality of the examination and concluded Ms. Sepeda remained cognitively intact for simple and repetitive tasks.

(*Id.*)

However, the ALJ mischaracterized the findings of Dr. Riffel, who administered the WAIS-IV, Auditory and Visual Memory Index, Bender Visual-Motor Gestalt Test-Second Edition, and WMS-IV.

9

(Doc. 15-8 at 31-33.) Contrary to what the ALJ noted, Dr. Riffel opined that Plaintiff's "Auditory and Visual Memory Index composite scores . . . should be reviewed cautiously." (*Id.* at 33.) Dr. Riffel did not question the validity of the IQ scores and noted that she considered all the test results "to be a fair representation of Ms. Sepeda's current psychological functioning." (*Id.* at 31.)

Importantly, as noted by the Ninth Circuit, the Regulations "require a narrative report that 'comment[s] on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.'" *Brooks v. Barnhart*, 167 Fed. Appx. 598, 600 (9th Cir. 2006) (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(6)(a)). Dr. Riffel did not determine whether Plaintiff's scores were consistent with her developmental history and degree of functioning. However, based upon the examination and test results, Dr. Riffel concluded Plaintiff had "*mild* mental retardation," and was "capable of completing simple and repetitive tasks." (Doc. 15-8 at 34, emphasis added.) This seems contrary to Plaintiff's IQ test results, which Dr. Riffel explained indicated an "an "Extremely Low intellectual performance." (*Id.* at 32, emphasis omitted.) The ALJ did not resolve the conflict in the evidence and failed to offer specific reasons for rejecting the IQ scores.

### 3. Additional impairment

The Ninth Circuit explained, "[A]n impairment imposes a significant work-related limitation of function when its effect on a claimant's ability to perform basic work activities is more than slight or minimal." *Fanning v. Bowen*, 827 F.2d 631, 633) (9th Cir. 1987). The Court "emphasize[d], however, that a finding of severity is not required to satisfy the more than slight or minimal standard." *Id.* at 633, n. 3 (citing *Edwards by Edwards v. Heckler*, 755 F.2d 1513, 1515 (11th Cir. 1985) ("significant" work-related limitation of function involves something more than "minimal" less than "severe")). As a result, this Court determined that "a finding of severe impairment[s] at step two is a *per se* finding of 'impairment imposing an additional and significant work-related limitation of function' as employed in the second prong of Listing 12.05(C)." *Campbell v. Astrue*, 2011 U.S. Dist. LEXIS 12742, at *52 (E.D. Cal. Feb.8, 2011) (citing *Fanning*, 827 F.2d at 633). Notably, the ALJ concluded at step two that Plaintiff had severe physical and mental impairments including "post-traumatic stress disorder" and "left ankle fracture, status-post open reduction and internal fixation." (Doc. 15-3 at 24.) Thus, Plaintiff established that she had "impairments imposing an additional and significant work-related limitation of

1  function," as required by Listing 12.05(C).

**B.     Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Applying the *Smolen* factors to this case, the ALJ failed to resolve the conflict in the evidence related to the validity of Plaintiff's IQ scores. Despite the low IQ scores, Dr. Riffel concluded Plaintiff had mild mental retardation—a finding the ALJ adopted. (*See* Doc. 15-3 at 24.) Similarly, several of Plaintiff's treating physicians opined that she appeared to have "average" intelligence. (*See, e.g.,* Doc. 15-9 at 7, 23, 31, 38.) Furthermore, Dr. Paxton reviewed the record and concluded Plaintiff "had a normal mood [and] average intelligence." (Doc. 15-8 at 67.) Thus, the matter should be remanded for the ALJ to re-evaluate the medical opinions, because it is not clear from the record that the ALJ would be required to find Plaintiff has "significantly subaverage general intellectual functioning" as required to satisfy Listing 12.05(C).

### CONCLUSION AND ORDER

The ALJ failed to resolve the conflict between Plaintiff's IQ scores and the physicians' opinions regarding Plaintiff's intellectual functioning, as is required by the Regulations. *See Allen v. Heckler,* 749 F.2d 577, 579 (9th Cir. 1984) *(*explaining "it is the ALJ's role" to resolve conflicts in the record); *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court

must resolve conflicts in the evidence"). Because the ALJ failed to resolve this conflict, the decision that Plaintiff is not disabled cannot be upheld. *See Sanchez*, 812 F.2d at 510.

Based upon the foregoing, **IT IS HEREBY ORDERED**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Jeanette Sepeda and against Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **May 8, 2015**                    **/s/ Jennifer L. Thurston**
                                                                    UNITED STATES MAGISTRATE JUDGE